Lois STRAWSER; Joyce Perry; James H. Sheppard; Mary Jean Booth; Joyce D. Barker; Betty Jean Gilman; Kathy Robertson, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

Nancy V. ATKINS, in her capacity as Commissioner of the Bureau of Medical Services, West Virginia Department of Health and Human Resources; Darrell W. Peters, in his capacity as supervisor, Third Party Liability Office of Administration, Accounts Receivable Unit of the Bureau for Medical Services, West Virginia Department of Health and Medical Services, West Virginia Department of Health and Human Resources; Paul L. Nusbaum, in his capacity as Secretary of the West Virginia Department of Health and Human Resources; Darrell V.

McGraw, in his capacity as Attorney General of the State of West Virginia; Citibank, N.A., Escrow Agent, Defendants–Appellees.

Stephen Albert Joseph, Jr.; Selma Charlene Hatfield; Howard S. Miller; Annie Sams Mosteller; David Kay Mullins; Mamie Brewer; Brenda Carson, Personal Representative of the Estate of Bondale Carson Miller; Margaret Renee Fleming, Personal Representative of the Estate of Earnestine Fleming; Laura Kelly, Personal Representative of the Estate of Elizabeth McAbee; Alford Welborn, Individually and on behalf of others similarly situated, Plaintiffs–Appellants,

v.

Charles M. Condon, in his official capacity as South Carolina Attorney General; Citibank, N.A.; William A. Prince, in his official capacity as Director of South Carolina Department of Health and Human Services, Defendants–Appellees,

and

Chase Manhattan Bank (USA), N.A., in its official capacity as Escrow Agent, Defendant.

Hilda White; The Estate of Robert Cornelison, by and through Personal Representative, Helen Forte; Maude C. Strickland; The Estate of Robert W. Eltz, by and through Personal Representative, Nellie Eltz; The Estate of Marvin King, by and through Personal Representative, Donna King; The Estate of Maggie Irving, by and through Personal Representative, Wanda Jones; The Estate of Annis E. Messer, by and through Personal Representative, Charles Messer; Deborah

Morey; The Estate of Hester Heatherly, by and through Personal Representative, Carroll Heatherly, Plaintiffs–Appellants,

v.

Michael F. Easley, Governor, in his official capacity as Governor of North Carolina; John Doe, in his official capacity as Tobacco Escrow Agent for the State of North Carolina; Richard H. Moore, in his official capacity as Treasurer of North Carolina; Carmen Hooker Buell, in her official capacity as Secretary of the North Carolina Department of Health & Human Services; Nina M. Yeager, in her official capacity as Director of the Division of Medical Assistance; The Golden L.E.A.F. (Long–Term Economic Advancement Foundation), Inc., a North Carolina Nonprofit Corporation, Defendants–Appellees.

Nos. 01–1175, 01–1557 and 01–2245.

United States Court of Appeals, Fourth Circuit.

Argued April 3, 2002.

Decided May 22, 2002.

**ARGUED:** Antonio Ponvert, III, Koskoff, Koskoff & Bieder, P.C., Bridgeport, Connecticut; Larry Stephen McDevitt, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Asheville, North Carolina, for Plaintiffs–Appellants. Charles R. Bailey, Bailey & Wyant, P.L.L.C., Charleston, West Virginia; John F. McCuskey, Shuman, McCuskey & Slicer, P.L.L.C., Charleston, West Virginia; Randall Lee Trautwein, Lamp, O'Dell, Bartram, Levy & Trautwein, P.L.L.C., Huntington, West Virginia; James Emory Smith, Jr., Assistant Deputy Attorney General, Columbia, South Carolina; Cory Hohnbaum, Kennedy, Covington, Lobdell & Hickman, L.L.P., Charlotte, North Carolina; James Carey Gulick, Senior Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Defendants–Appellees. **ON BRIEF:** Richard A. Bieder, Koskoff, Koskoff & Bieder, P.C., Bridgeport, Connecticut; Troy N. Giatras, Giatras & Webb, Charleston, West Virginia; Robert James Gould, Charleston, West Virginia; W. Carleton Metcalf, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Asheville, North Carolina; Charles E. Burgin, Dameron, Burgin & Parker, P.A., Marion, North Carolina; John A. Hagins, Jr., Karen W. Creech, Covington, Patrick, Hagins, Stern & Lewis, P.A., Greenville, South Carolina; Dick James, The Dick James Law Firm, Greenville, South Carolina; William A. Jordan, William A. Jordan, L.L.C., Greenville, South Carolina; J. David Flowers, J. David Flowers, P.A., Greenville, South Carolina, for Plaintiffs–Appellants. John T. Molleur, Bailey & Wyant, P.L.L.C., Charleston, West Virginia; Roberta F. Green, Shuman, McCuskey & Slicer, P.L.L.C., Charleston, West Virginia; Frances A. Hughes, Managing Deputy Attorney General, State of West Virginia, Charleston, West Virginia; Charlie Condon, Attorney General, Treva G. Ashworth, Deputy Attorney General, Columbia, South Carolina; Marie Ellen Gibbs, Kennedy, Covington, Lobdell & Hickman, L.L.P., Charlotte, North Carolina; Richard G. Hepfer, Deputy General Counsel, Department of Health and Human Services, Columbia, South Carolina; Roy Cooper, North Carolina Attorney General, Daniel F. McLawhorn, Special Deputy Attorney General, North Carolina Department Of Justice, Raleigh, North Carolina; Matthew W. Sawchak, Ellis &

Winters, L.L.P., Raleigh, North Carolina, for Defendants–Appellees.

Before MOTZ and TRAXLER, Circuit Judges, and W. Craig BROADWATER, United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge TRAXLER and Judge BROADWATER joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

These appeals grow out of a 1998 settlement of litigation that many states brought against a group of major tobacco companies. West Virginia, North Carolina, and South Carolina, like all other states participating in the settlement, stand to receive substantial funds pursuant to it. Residents of each of those states, who have received Medicaid assistance for medical problems related to tobacco, filed suit to obtain a share of the funds their respective states will receive under the settlement. In each case, the district court dismissed the patients' complaints on multiple grounds. Because federal law bars the claims, *see* 42 U.S.C.A. § 1396b(d)(3)(B)(ii) (West Supp.2001), we affirm the judgment of the district court in each case.

## I.

These cases concern the relationship between the Medicaid program, which provides funds for health care for poor people, and the 1998 tobacco settlement. To facilitate understanding of the issues involved, we briefly describe the relevant federal and state Medicaid law, the litigation and 1998 settlement between the states and the tobacco companies, and the claims raised in these appeals.

### A.

In the United States, a person who cannot pay his or her medical bills may be eligible for financial assistance under the Medicaid program. If so, and if the state in which the person lives participates in the federal Medicaid program, both the federal government and the government of his or her state contribute through the program to pay some of the medical bills. *See* 42 U.S.C.A. §§ 1396, 1396a–1396u (1992 & West Supp.2001). West Virginia, North Carolina, and South Carolina all participate in the Medicaid program and receive federal funds under the program. *See* N.C. Gen.Stat. § 108A–54 (1999); W. Va.Code Ann. §§ 9–1–1 to 9–2–3 (Michie 1998 & Supp.2001); S.C.Code Ann. § 43–7–20, 43–7–410 to 43–7–460 (Law. Co-op.1985 & Supp.2001).

In some instances, third parties are liable for the health-care expenses of Medicaid patients, through, for example, insurance, tort liability, or a court order based on familial obligation. To obtain federal assistance with Medicaid costs, a state must require Medicaid recipients to assign any rights they possess against such third parties to the state, and must make reasonable efforts to collect on all third-party claims that are assigned. *See* 42 U.S.C.A. §§ 1396a(a)(25), 1396k(a) (West 1992 & Supp.2001). In keeping with these federal requirements, West Virginia, North Carolina, and South Carolina each mandate such an assignment. *See* W. Va.Code Ann. § 9–5–11(a) (Michie 1998); S.C.Code Ann. §§ 43–7–420 to 43–7–430 (Law.Co-op.Supp. 2001); N.C. Gen.Stat. §§ 108A–57, 108A–59(a) (1999).

Federal law also governs a participating state's distribution of any recovery on a third-party claim assigned by a Medicaid

recipient. If a state recovers "under an assignment," payments from third parties go first to the state up to its relevant Medicaid expenses; then to the federal government, up to its relevant Medicaid expenses (minus an incentive payment to encourage the state to collect, *see* 42 C.F.R. § 433.153 (2001)); and finally, if any funds remain, to the patient who assigned the claim. *See* 42 U.S.C.A. § 1396k(b); *see also* 42 C.F.R. § 433.154 (2001). A state must distribute any remainder to the individual Medicaid recipient. *See* 42 U.S.C.A. § 1396k(b) (requiring that after both governments cover all of their expenses, "the remainder of such amount collected *shall* be paid to such individual" (emphasis added)).

### B.

In the 1998 settlement of the tobacco litigation, each settling state recovered a substantial amount of money from tobacco companies. In many of the settling states, including West Virginia, North Carolina, and South Carolina, Medicaid patients then brought suit against state officials.[1] The patients contend that at least part of the tobacco settlement constituted a Medicaid recovery subject to the statutory framework outlined above. Therefore, they argue, state officials should distribute

excess funds recovered under the settlement to them. Before analyzing these contentions, we describe the nature of the state lawsuits against tobacco companies and the settlement reached.

### 1.

In the 1990s, nearly all the states sued major tobacco companies for harm arising from the deliberate concealment of the health risks posed by tobacco.[2] In their complaints, West Virginia, North Carolina, and South Carolina all cited the medical costs of treating smoking-related injuries as a major source of damages.

West Virginia filed suit on September 20, 1994. The state's third amended complaint lists a number of tobacco harms to the state, including its expenses in treating tobacco-related health problems, its expenses in countering tobacco advertising aimed at young people, products-liability claims, and antitrust violations. The complaint includes fourteen counts; several discuss damage to the state other than health-care costs, such as the cost of public campaigns about the dangers of tobacco, and pursue relief other than the money the state had spent on health-care costs.

South Carolina filed suit on May 12, 1997. Preliminary language in its amend-

---

1. Every federal appellate court to consider similar patients' claims has rejected them. *See Greenless v. Almond,* 277 F.3d 601 (1st Cir.2002); *Tyler v. Douglas,* 280 F.3d 116 (2d Cir.2001); *Harris v. Owens,* 264 F.3d 1282 (10th Cir.2001); *McClendon v. Georgia,* 261 F.3d 1252 (11th Cir.2001); *Floyd v. Thompson,* 227 F.3d 1029 (7th Cir.2000); *see also Watson v. Texas,* 261 F.3d 436 (5th Cir.2001) (addressing similar claims based on a separate settlement between Texas and the tobacco companies); *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.,* 256 F.3d 879 (9th Cir.2000) (ruling that Indian tribes lacked standing to challenge the tobacco settlement). The district courts have also uniformly rejected such claims in cases too numerous to list.

2. The states and tobacco companies participating in the tobacco settlement have varied over time. *See, e.g., Star Scientific, Inc. v. Beales,* 278 F.3d 339 (4th Cir.2002) (considering the claims of a tobacco company facing a choice as to whether to participate in the settlement); *infra* (noting North Carolina's decision to join the settlement after it had been executed). Because nothing turns on these details in these appeals, we have not attempted to specify which tobacco companies and states were involved at any given point.

ed complaint describes only the medical expenses the state had incurred. The complaint includes sixteen counts. The only harm to the state discussed in any of the counts is the cost of medical treatment for tobacco-related health problems. However, South Carolina did seek an order requiring the tobacco companies to fund a campaign of public education about smoking and health, as well as orders barring them from marketing and sales practices aimed at minors and requiring them to disclose information related to tobacco.

North Carolina filed suit on December 21, 1998. (North Carolina's lawsuit actually followed the execution of the settlement between the tobacco companies and many other states by several weeks; on the same day, the state both filed suit and immediately dismissed its suit in order to join the settlement.) The complaint included two state-law claims, for restraint of trade and unfair commercial practices. The state cited the financial harm that the shrinking tobacco market inflicted on its communities that depended on growing tobacco and health-care costs incurred in treating smoking-related illnesses. It sought damages "for the past and future medical costs paid by North Carolina to medical assistance beneficiaries, state employees, and others for treatment of tobacco-related illnesses." The state also sought injunctions and "mandatory orders" to bar tobacco advertising and tobacco-related conspiracy and to provide funds for public education about the dangers of tobacco and for financial assistance to "tobacco-dependent communities."

### 2.

Late in 1998, without admitting liability, the tobacco companies settled the claims of West Virginia, North Carolina, South Carolina, and most other states. In a document entitled "Master Settlement Agree-ment" (MSA), the companies agreed to pay billions of dollars to the states in future installments. Under the MSA, settlement funds went into escrow, with Citibank as the escrow agent. The total amounts involved cannot be fixed exactly, but the patients pursuing these cases allege that West Virginia expects to receive $1.933 billion, South Carolina $2.3 billion, and North Carolina $4.6 billion, and that these payments exceed what each state has paid and expects to pay for Medicaid costs related to tobacco.

In return for these funds, the states released their rights to pursue a wide range of claims against the tobacco companies. The states released the companies from liability based on their past conduct and from future monetary liability arising solely from use of or exposure to tobacco. Some of the claims released by the states did not relate to health-care costs; the MSA covered all claims "directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing, or health effects of, (B) the exposure to, or (C) research, statements or warnings regarding, Tobacco Products."

West Virginia, North Carolina, and South Carolina have all received payments under the MSA. A South Carolina statute assigns all MSA receipts to a Tobacco Settlement Revenue Authority created by the statute, which issues bonds (though not to the state) and pays their proceeds to various trust funds. S.C.Code Ann. § 11–49–50, 11–49–70 (Law.Co-op.Supp.2001). Similarly, a North Carolina statute assigns 50% of that state's MSA funds to a non-profit corporation called The Golden L.E.A.F. (Long-term Economic Advancement Foundation) to provide financial assistance to tobacco-dependent areas of North Carolina. *See* 1999 N.C. Sess.

Laws 2, *available at* http://www.ncga.state.nc.us/SessionLaws/1999___/sl19990002/default.htm (last visited April 11, 2002).

In 1999, after the tobacco settlement had been reached, Congress passed an amendment to federal Medicaid law that specifically addresses the MSA, in a section of an emergency appropriations act, entitled "Prohibition on Treating Any Funds Recovered From Tobacco Companies as an Overpayment for Purposes of Medicaid." *See* 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, 113 Stat. 57, 103–04, *codified at* 42 U.S.C.A. § 1396b(d)(3)(B) (West Supp. 2001). Congress addressed the tobacco settlement in two provisions that altered the usual manner for distribution of recovery on third-party claims. *See* 42 U.S.C.A. § 1396b(d)(3)(B)(i, ii).

The first provision exempts the tobacco settlement from the usual statutory payment scheme for state reimbursement of federal Medicaid costs. Ordinarily, a state reimburses the federal government by designating the federal share of a recovery as part of an "overpayment" on the federal obligations under Medicaid, to be repaid to the federal government. *See* 42 U.S.C.A. §§ 1396b(d)(2)(A), (2)(B), (3)(A) (West Supp.2001). Under the 1999 amendment, however, Congress directed that this procedure

> shall not apply to any amount recovered or paid to a State as part of the comprehensive settlement of November 1998 between manufacturers of tobacco prod-

ucts ... and State Attorneys General [the MSA], or as part of any individual State settlement or judgment reached in litigation initiated or pursued by a State against one or more such manufacturers.

42 U.S.C.A. § 1396b(d)(3)(B)(i). This provision, which for ease of reference we designate "clause (i)," effectively eliminates any federal right to a share of the proceeds of the M.S.A. § or certain other tobacco settlements.

The second provision, which is crucial to our disposition of these appeals, states that, except for litigation costs proscribed by 42 U.S.C.A. § 1396b(i)(19),

> a State may use amounts recovered or paid to the State as part of a comprehensive or individual settlement, or a judgment, described in clause (i) for any expenditures determined appropriate by the State.

42 U.S.C.A. § 1396b(d)(3)(B)(ii). We refer to this provision herein as "clause (ii)."

### C.

By April 26, 2000, Medicaid patients suffering from tobacco-related illnesses had filed the three similar amended complaints against officials in West Virginia, North Carolina, and South Carolina, which form the basis for these appeals.[3] In these complaints, the patients seek a share of the M.S.A. § funds received by their respective states, under the theory that the Medicaid recovery provisions described above apply to the M.S.A. § settlement, and that they have a right to payments in

---

**3.** For ease of reference, we often refer within to the individual state defendants as "the states." The patients in all three cases also filed suit against Citibank, the escrow agent for the MSA, and the North Carolina patients sued the nonprofit organization that received a share of the state's funds from the tobacco settlement, The Golden L.E.A.F. Both The Golden L.E.A.F. and Citibank make a number

of arguments on the merits in their own behalf. Because we rule that the patients have no claim at all to the M.S.A. § funds paid to the states, and because the patients' claims against the non-state defendants are derivative of their other claims, we need not address the specific arguments made by The Golden L.E.A.F. or Citibank.

excess of the states' actual medical expenses. Specifically, proceeding under 42 U.S.C.A. § 1983, the Medicaid patients allege that state officials violated provisions of the Medicaid statute that require states to disburse excess funds to individual recipients, *see* 42 U.S.C.A. § 1396k(b), and make reasonable efforts to pursue all third-party liability on behalf of individual patients. *See* 42 U.S.C.A. § 1396a(a)(25). They further allege that these asserted deprivations violate the Due Process Clause and the Takings Clause.

By suing state officials rather than the state itself, the patients seek to invoke the *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), exception to the Eleventh Amendment immunity of the states. The patients ask for a declaratory judgment of their rights and their state's obligations under federal Medicaid law, and injunctive relief requiring state officials *inter alia* to "disburse ... or to cause the disbursement" of the MSA settlement funds that assertedly belong to the patients. In each case, the district court dismissed the patients' claims on multiple grounds. *See Strawser v. Lawton*, 126 F.Supp.2d 994 (S.D.W.Va.2001); *Joseph v. Condon*, No. 00–324 (D.S.C. Mar. 19, 2001) (opinion and order dismissing the case with prejudice); *White v. Hunt*, No. 00–14 (W.D.N.C. Sept. 25, 2001) (same); *White v. Hunt*, No. 00–14, 2000 WL 33261006

(W.D.N.C. July 13, 2000) (magistrate judge's report and recommendations).

These appeals followed. Our review is *de novo*. *See TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir.2001); *Lynn v. West*, 134 F.3d 582, 585 (4th Cir.1998). We heard oral argument in all three cases. Because of the identical central issues presented in each, however, we resolve all three appeals in this single opinion.

## II.

■ The patients' central contention is that the usual provisions for distribution of Medicaid recoveries apply to the funds the states receive from the MSA, so that under 42 U.S.C.A. § 1396k(b), they have a federal right to a share of those funds. The state officials respond that the district court in each case properly dismissed the complaints because, for numerous reasons, the complaints fail to state a claim on which relief can be granted and, in any event, the state officials enjoy Eleventh Amendment immunity from these lawsuits. Each district court made rulings on both grounds, and, in particular, each ruled that the 1999 amendment to the Medicaid statute bars any claim by the patients to part of their respective states' shares of the tobacco settlement.[4] We affirm on that basis.

---

4. Although the United States District Court for the District of South Carolina did not explicitly dismiss the suit before it for failure to state a claim, two of the court's rulings addressed the merits. First, the court ruled that the state had not violated federal law in any respect; although the court handled that determination as an Eleventh Amendment issue under *Ex parte Young*, it more properly constitutes a determination on the merits. *See Harris*, 264 F.3d at 1289; *TFWS*, 242 F.3d at 204–06; *Booth v. Maryland*, 112 F.3d 139, 142–43 (4th Cir.1997). The court also con-

cluded that "Congress has relieved states participating in the MSA of any obligation to disburse funds to Medicaid recipients pursuant to § 1396k(b) of the Act" and that therefore "Plaintiffs have been deprived of no right or privilege secured by the Act" and " § 1983 is not implicated in the within action." In any case, of course, we may affirm on any ground revealed in the record. *See, e.g., Adventure Communications, Inc. v. Kentucky Registry of Election Fin.*, 191 F.3d 429, 439 n. 9 (4th Cir.1999) (quoting *PHP Healthcare Corp. v. EMSA Ltd. P'ship*, 14 F.3d 941, 945 (4th Cir.1993)).

### A.

Even though generally "[q]uestions of jurisdiction ... should be given priority," and some courts have held that the Eleventh Amendment constitutes such a jurisdictional bar, *see Vermont Agency of Natural Res. v. United States,* 529 U.S. 765, 778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (discussing circuit split), in this case, we can properly base our holding on the plain language of the 1999 amendment to the Medicaid statute without resolving the Eleventh Amendment question. This is so for two reasons.

First, the limited nature of our holding permits this. In *Vermont Agency,* the Supreme Court specifically held it "appropriate" to determine whether a statute permitted a cause of action against the states without resolving an Eleventh–Amendment question. *Id.* at 779–780, 120 S.Ct. 1858. The Court explained that the statutory question was both "logically antecedent" to the Eleventh–Amendment question and so limited that there was no "realistic possibility that addressing" it could "expand the Court's power beyond the limits that the jurisdictional restriction has imposed." *Id.* at 779, 120 S.Ct. 1858. *Cf. BellSouth Telecomms., Inc. v. North Carolina Utils. Comm'n,* 240 F.3d 270, 275–76 (4th Cir.2001) (ruling that a federal court may not avoid ruling on an assertion of Eleventh Amendment immunity while permitting a case to proceed). Even if the statutory question here is not as plainly "logically antecedent" to the Eleventh Amendment question,[5] it provides the basis for an even more limited holding than that in *Vermont Agency.* That case held that individual plaintiffs could obtain *no* relief of any type from the states under a

particular federal statute (31 U.S.C.A. § 3729(a) (West Supp.2001)); we merely hold that individual plaintiffs cannot obtain *certain* relief (tobacco settlement funds) from the states under a particular federal statute (41 U.S.C.A. § 1396k(b)). Thus, as in *Vermont Agency,* resolution of the statutory question here does not involve a court in "pronounc[ing] upon any issue, or upon the rights of any person, beyond the issues and persons that would be reached under the Eleventh Amendment inquiry." *Vermont Agency,* 529 U.S. at 799, 120 S.Ct. 1858.

■ Second, and independent of the limited nature of our holding, the states' litigating position renders it appropriate to resolve these cases on the basis of the Medicaid statute. Both in their briefs and at oral argument the states have relied on the contention that the 1999 amendment bars the patients' claims, as well as their Eleventh Amendment defense. Although at oral argument counsel for the state officials carefully refrained from in any way waiving that defense, they did not insist on it. Thus, like the state officials in *McClendon,* the officials here argue the merits and rely "upon that defense only if it is necessary to prevent judgment against them on the merits." 261 F.3d at 1238. The Eleventh Amendment can be waived by a party, *see, e.g., College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), and so does not automatically divest a court of jurisdiction. *See Wisconsin Dept. of Corr. v. Schacht,* 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998). The states' restricted use of the Eleventh Amendment

---

5. The statutory question here well may be just as "logically antecedent" to the constitutional question; the statutory question in this case is in the nature of an affirmative defense. Courts often base their holdings on an affir-

mative defense without even resolving the existence of a cause of action. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (1990), and the many cases cited therein.

defense here provides another reason permitting us "to decide in their favor on the merits." *McClendon*, 261 F.3d at 1258.

■ Additionally, we note that avoiding the constitutional question and resolving this case on the merits—on the basis of the 1999 amendment to the Medicaid statute—well accords with the venerable principle that a court will not decide a constitutional question, particularly a complicated constitutional question, if another ground adequately disposes of the controversy. *See INS v. St. Cyr*, 533 U.S. 289, 299 301 & n. 13, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).[6] While the statutory question here is easy, several courts have concluded that the Eleventh–Amendment question presents real difficulty. *See Greenless*, 277 F.3d at 607; *Tyler*, 280 F.3d at 121; *Floyd*, 227 F.3d at 1034–35. In fact, no circuit has upheld the states' contention that the *Ex parte Young* exception does not apply. *See Harris*, 264 F.3d at 1288–94 (expressly holding that an *Ex parte Young* exception is available); *Greenless*, 277 F.3d at 606–08 (holding on the merits); *Tyler*, 280 F.3d at 121 (same); *McClendon*, 261 F.3d at 1256–59 (same); *Floyd*, 227 F.3d at 1034–35 (same).

For these reasons, we can and do resolve this case on the merits, without reaching the Eleventh–Amendment question.

## B.

Resolution of the patients' claims on the merits is straightforward. But for an exception that is irrelevant here for litigation costs proscribed by 42 U.S.C.A. § 1396b(i)(19), the 1999 Medicaid amendment expressly provides that "a State may use amounts recovered or paid to the State" under the MSA "for any expenditures determined appropriate by the State." *See* 42 U.S.C.A. § 1396b(d)(3)(B)(ii). The states argue that the permission to use the funds freely applies to *all* "amounts recovered or paid to" them under the tobacco settlement, and that it therefore extinguishes the rights of individual Medicaid recipients under 42 U.S.C.A. § 1396k(b), with respect to tobacco-settlement funds alone. The patients respond that the permission to undertake "any expenditures determined appropriate by the State" applies only to the funds that the federal government itself relinquished. The statutory text supplies a clear answer.

The relevant statutory language in clause (ii) provides that:

> a State may use amounts recovered or paid to the State as part of a comprehensive or individual settlement, or a judgment, described in clause (i) for any expenditures determined appropriate by the State.

42 U.S.C.A. § 1396b(d)(3)(B)(ii). Clause (i), meanwhile, provides that certain provisions under which the federal government ordinarily recoups its share of a Medicaid recovery

> shall not apply to any amount recovered or paid to a State as part of the comprehensive settlement of November 1998 between manufacturers of tobacco products ... and State Attorneys General [the MSA], or as part of any individual State settlement or judgment reached in litigation initiated or pursued by a State against one or more such manufacturers.

42 U.S.C.A. § 1396b(d)(3)(B)(i). Clause (i) thus discusses an "amount," the MSA it-

---

**6.** We recognize that this principle does not permit a court to refrain from resolving a disputed question as to Article III jurisdiction, *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–100 & n. 3, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), but no party contends that this case involves any lack of Article III jurisdiction.

self, and "individual state settlement[s] or judgment[s]."

The patients' theory rests on two propositions. First, they assert that in clause (ii), the phrase "described in clause (i)" modifies "amounts," not "settlement, or ... judgment." According to the patients, clause (ii) only provides the states federal permission to do what they like with "amounts ... described in clause (i)," whatever those might be. Second, the patients contend that the "amounts ... described in clause (i)" constitute only "the federal share of the tobacco settlement," not all the money recovered. Thus, the permission granted in clause (ii) applies only to the federal share of the MSA, leaving the individual claims under § 1396k(b) intact.

■ Neither proposition is tenable. First, clause (ii)'s term "described in clause (i)" is better read to modify "settlement, or ... judgment." Clause (ii) provides that "a State may use amounts recovered or paid to a state as part of a comprehensive or individual settlement, or a judgment, described in clause (i)" as it likes. It is the phrase "settlement, or ... judgment" that would be vague without the modifier directing the reader to clause (i), not the phrase "amounts recovered or paid to the State." An amount recovered or paid to a state under a settlement or judgment is the incoming money, plainly. Meanwhile, without more, "a comprehensive or individual settlement, or a judgment," is much broader than the scope of

the 1999 amendment. The modifier is only necessary for the latter.

Moreover, even if the phrase "described in clause (i)" did modify "amounts," the "amount" that clause (i) itself discusses is "*any* amount recovered or paid to a State" as a result of the MSA or other tobacco settlements—not just the federal share. *See Tyler*, 280 F.3d at 122–23; *Harris*, 264 F.3d at 1295–96; *Strawser*, 126 F.Supp.2d at 1000. This is true even though clause (i) itself functions to exempt such amounts from the ordinary processes by which the states repay the federal government for its share of Medicaid expenses. We thus reject both propositions supporting the patients' reading of clause (ii).

■ Turning to the impact of clause (ii) on the patients' claims in these cases, we consider its statement that "a State may use amounts recovered or paid to the State" under the MSA "for any expenditures determined appropriate by the State." This provision permits a state to use "amounts recovered or paid ... for *any* expenditure," and does not qualify the term "amounts." There is no ambiguity in this sentence: Congress declares that the states may spend any money they receive under the MSA on any expenditure. *See Greenless*, 277 F.3d at 609 ("Congress made its intent clear in the amendment."); *Tyler*, 280 F.3d at 124 ("[T]here is no ambiguity in the language of § 1396b(d)(3)(B)(ii)."); *Harris*, 264 F.3d at 1295.[7]

7. The West Virginia patients argued unsuccessfully below that the 1999 amendment raised problems of retroactivity. *See Strawser*, 126 F.Supp.2d at 1002 n. 5. Neither they nor the South Carolina patients press this argument in their briefs on appeal. The North Carolina patients do press such an argument on appeal, but they failed to preserve it in objecting to the magistrate judge's recommendation of dismissal. *See* 28 U.S.C.A.

§ 636(b)(1) (West 1993); *Praylow v. Martin*, 761 F.2d 179, 180 n. 1 (4th Cir.1985) (ruling that an issue is waived where no specific objection is filed). Accordingly, we need not and do not reach it; we note, however, that two of our sister circuits have expressly rejected such an argument. *See Greenless*, 277 F.3d at 609 (rejecting a retroactivity argument against application of the 1999 amendment); *Harris*, 264 F.3d at 1296–97 (same).

### C.

Notwithstanding the clarity of this language, the patients offer several reasons why we should ignore it.

### 1.

First, they maintain that the legislative history, the title, and the context of the 1999 amendment require rejection of its clear language.

■ Even if it were appropriate to consider legislative history when the statutory text is plain, and it is not, the legislative history here does not contradict the statutory text; indeed, the legislative history does not even mention individual Medicaid recipients. *See Tyler,* 280 F.3d at 124; *Harris,* 264 F.3d at 1297. Rather, the legislative history of the 1999 amendment describes, without reference to individual patients, the existence and nature of a federal right to a share of the MSA. The patients actually emphasize this silence, suggesting that it supports them, because the legislative history does not expressly discuss the states' entitlement to all funds from the tobacco litigation here. However, total silence on a point is far from the "substantial, unambiguous evidence" necessary for a court to consider reaching "a contrary interpretation" of clear statutory language. *Matala v. Consolidation Coal Co.,* 647 F.2d 427, 430 (4th Cir.1981).

The title of the amendment similarly contains no mention of the rights of individual Medicaid patients. That title—

"Prohibition on Treating Any Funds Recovered From Tobacco Companies as an Overpayment for Purposes of Medicaid"—instead simply refers to "an overpayment," the term of art used for refunding state money to the federal government in this context. *See* 42 U.S.C.A. §§ 1396b(d)(2)(A), (2)(B), (3)(A). Nor, contrary to the patients' suggestion, does the 1999 amendment's context—the amendment's "distance" of 113 pages in the U.S.C.A. from § 1396k(b), under which the patients seek to recover—affect the amendment's legal import.

■ In short, we agree with the states (and with the First, Second, and Tenth Circuits) that the plain language of the Medicaid statute, specifically the 1999 amendment, permits the states to do whatever they like with all "amounts recovered" under the MSA, that is, with all the money they derive from it. *See Greenless,* 277 F.3d at 605–09; *Tyler,* 280 F.3d at 121–24; *Harris,* 264 F.3d at 1294–97; *see also McClendon,* 261 F.3d at 1262 (Noonan, J., concurring in the judgment).[8]

### 2.

■ The patients next contend that to find the 1999 amendment dispositive, we must conclude that it repealed § 1396k(b) by implication, a conclusion that they say we should be extremely reluctant to draw. The plain language of the 1999 amendment does necessarily signal a marked departure from § 1396k(b)'s general require-

---

8. At oral argument the patients contended that the district courts had improperly overlooked their claims under the Takings Clause. *See* U.S. Const. amend. V. Their briefs in this court make no Takings Clause argument; nor have they asserted that the 1999 amendment itself constitutes or unconstitutionally authorizes a taking. *Cf.* Joseph Reply at 12 ("American citizens cannot be stripped of their statutory rights *sub silentio.*"); White Reply at 19 (addressing whether Congress wished "to take private property" in an argument about how "courts may properly interpret acts of Congress"). The states contend that, regardless of the effect of the 1999 amendment on their use of MSA funds, the tobacco settlement did not resolve and had no effect on individual claims against the tobacco companies, which remain viable in separate actions. *See also McClendon,* 261 F.3d at 1261–62; *Floyd,* 227 F.3d at 1033–34, 1037. In light of our disposition of these appeals, we need take no position on that issue.

ment for the final distribution of monies to individual Medicaid recipients. *See Greenless*, 277 F.3d at 609 n. 8; *Strawser*, 126 F.Supp.2d at 1000 n. 4. And courts do indeed disfavor repeals by implication. *See, e.g., Rodriguez v. United States*, 480 U.S. 522, 524, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987); *Rodgers v. United States*, 185 U.S. 83, 87–88, 37 Ct.Cl. 552, 22 S.Ct. 582, 46 L.Ed. 816 (1902). But we do not believe that the 1999 amendment repeals § 1396k(b) by implication.

In support of their contrary view, the patients cite only cases involving repeals of entire statutes or rules. *See, e.g., United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 169, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) ("[T]he expectation that there would be some expression of an intent to 'repeal' is particularly strong in a case ... in which the 'repeal' would extend to virtually every case to which the statute had application."); *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 133 (2d Cir.1992) (noting that finding a repeal would be "a quite significant modification" of a general rule). By contrast, the effect of the 1999 amendment is highly specific. The amendment does not repeal the general operation of § 1396k(b). *See Greenless*, 277 F.3d at 608. Every Medicaid recipient—except those seeking tobacco money from the states—has the same rights under § 1396k(b) after the 1999 amendment as he or she had before it.

Rather than repeal by implication a general statute (§ 1396k(b)), the 1999 amendment simply created a specific, discrete exception to that statute. *See Harris*, 264 F.3d at 1296 (ruling that the 1999 amendment "simply addresses one particular application and carves out an exception"). "It is a well-settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling."

*Kepner v. United States*, 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114 (1904) (citations omitted); *see also Stewart v. Smith*, 673 F.2d 485, 492 (D.C.Cir.1982) ("When one statute speaks in general terms while the other is specific, conflicting provisions may be reconciled by carving out an exception from the more general enactment for the more specific statute."); 1A Norman J. Singer, *Sutherland Statutory Construction* § 23:16 (6th ed.2002); *cf. Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) ("In a variety of contexts the Court has held that a precisely drawn, detailed statute preempts more general remedies."). Although the 1999 amendment conflicts with § 1396k(b) with respect to individual recovery under the tobacco settlement, "[b]oth will be given effect if the general language of [§ 1396k(b) ] be construed as applying generally, and [the 1999 amendment] be construed as creating an exception to its general application." *Niagara Fire Ins. Co. of New York v. Raleigh Hardware Co.*, 62 F.2d 705, 709 (4th Cir.1933); *see also Greenless*, 277 F.3d at 608–09 (rejecting a repeal-by-implication argument); *Harris*, 264 F.3d at 1296 (same).

Finally, the patients contend that because the 1999 amendment was part of an emergency appropriations rider, we should be even more reluctant to hold that it affects an earlier substantive statute. Again, we agree as a general matter: "According to its own rules, Congress is not supposed to use appropriations measures as vehicles for the amendment of general laws.... [T]he doctrine disfavoring repeals by implications is said to apply 'with full vigor' when the subsequent law is an appropriations measure." *City of Los Angeles v. Adams*, 556 F.2d 40, 48 (D.C.Cir. 1977) (citations omitted); *see also TVA v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Supreme Court has ruled, however, that despite legislative rules to the contrary, Congress

may "accomplish its purpose by an amendment to an appropriation bill, or otherwise." *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) (citations omitted), *cited approvingly in United States v. Will*, 449 U.S. 200, 221–24, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *see also* 1A Singer, *Sutherland Statutory Construction*, § 23:17 ("A purpose to repeal substantive provisions in earlier statutes may be manifested by provisions in subsequent appropriation acts directing what use may be made of funds in relation to the subject dealt with in the earlier act.").

■■■ If two statutes can otherwise be reconciled, a court should not read a later amendment as an exception to an established general statute. *See TVA*, 437 U.S. at 189–93, 98 S.Ct. 2279. But as any child with an allowance knows, permission to use money "for any expenditure" clearly conflicts with a mandate to give some of the money to someone else. "Where Congress chooses" to amend substantive law in an appropriations rider, "we are bound to follow Congress's last word on the matter even in an appropriations law." *City of Los Angeles*, 556 F.2d at 49. With respect to the tobacco settlement, Congress has spoken, and spoken clearly.

### III.

In sum, we hold that 42 U.S.C.A. § 1396b(d)(3)(B)(ii) bars any recovery by individual Medicaid recipients to a share of the money the states receive under the Master Settlement Agreement.[9] The judgments of the district courts are therefore

*AFFIRMED.*

---

9. In addition to the ground on which we rule, the states argue that individual Medicaid recipients only assigned their third-party claims to the states up to the amount the states had spent on their care; that the states did not sue the tobacco companies on behalf of individual Medicaid recipients; that the MSA did not resolve claims that individual Medicaid recipients might have against the tobacco companies; that the tobacco settlement did not constitute a Medicaid recovery at all, so neither the federal government nor individual recipients had any right to any of its funds; that the state officials have no authority under South Carolina law to disburse MSA funds; and that even if the MSA constituted a Medicaid recovery in part, any money the states received in the tobacco settlement was for non-Medicaid claims that were settled in the MSA, so no excess exists to be refunded under 42 U.S.C.A. § 1396k(b). We need not address these arguments given our disposition of these appeals.